F I L E D
Clerk
District Court

JUN -5 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

1  CARLSMITH BALL LLP
   Carlsmith Building, Capitol Hill
2  P.O. Box 5241
   Saipan, MP 96950-5241
3  Tel No. 670.322.3455

4  Attorneys for Defendant
   Maeda Pacific Corporation

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN MARIANA ISLANDS

| TOSHIHIRO TAKAHASHI, | CIVIL ACTION NO. CV 05-0026 |
|---|---|
| Plaintiff, | REQUEST FOR FURTHER CONSIDERATION OF *MOTION IN LIMINE* TO EXCLUDE TESTIMONY OF DR. H. CHRISTINE BROWN |
| vs. | |
| MAEDA PACIFIC CORPORATION, | Trial Date: June 12, 2006<br>Time: 9:00 a.m. |
| Defendant. | Judge: Hon. Alex R. Munson |

On May 19, 2006 the Court held a hearing on Defendant's *Motion In Limine* to exclude the testimony of Dr. H. Christine Brown, Plaintiff's designated medical expert. At the conclusion of the hearing on that motion the Court ordered Plaintiff's counsel to produce Dr. Brown on May 24, 2006 to be deposed by Defendant's counsel. Pursuant to the Court's Order Dr. Brown did appear and she was deposed.

Based on the deposition testimony, the Memorandum of Points and Authorities attached to the *Motion In Limine*, the exhibits and declaration of Defendant's counsel attached to Defendant's *Motion In Limine*, Defendant requests the Court further consider the motion to exclude the testimony of Dr. H. Christine Brown as Plaintiff's designated medical expert.

The following is taken from the deposition of Dr. H. Christine Brown of May 24, 2006:

4844-2579-6097.1.058671-00001

1.     She has never been qualified as an expert by any court (Exhibit A, Dr. Brown deposition, page 4, lines 7-8.)

2.     She bases her qualification to testify as an expert regarding the nature and extent of the injury to Plaintiff's finger on:

    1.     She went to medical school

    2.     During her family practice residency training in 1991-1992 she spent a couple of weeks working with a hand surgeon and had exposure to sub-specialties including neurology.

(Exhibit A: Page 4, lines 9-22)

3.     She examined Plaintiff on one occasion and that examination lasted 20 minutes.

(Exhibit A: Page 10, lines 10-16)

4.     Her examination of Plaintiff's finger consisted of asking him to move the finger and observation of the finger.

(Exhibit A: Page 14, line 2-12; Page 14, line 22-24)

5.     No other testing was done.

(Exhibit A: Page 16, line 5-7)

6.     Dr. Brown is unable to say what nerve is injured.

(Exhibit A, page 17, lines 19-21).

7.     She agrees that she is not qualified to express an opinion as to the cost of any treatment by a neurologist.

(Exhibit A: page 20, Lines 8-11).

8.     "Q: Your report indicates that from your prospective (sic) to determine the extent of the injury or the permanency of any injury, that determination should be made by a neurologist, is that a fair statement?"

"A: Yes."

(Exhibit A: Page 21, lines 1-5.)

    Subsequent to the deposition of Dr. Brown Defendant's counsel was provided a copy of Dr. Brown's handwritten notes of the examination of Plaintiff on April 19, 2006. In that exam

note Dr. Brown recites:

"<u>Appears</u> to be a nerve injury." (Emphasis supplied)

(Exhibit B: Handwritten examination notes of Dr. H. Christine Brown of the 4/19/06 examination of Plaintiff).

Dr. Brown's opinion does not rise to the level of that of an expert witness. She cannot and does not express an opinion based on reasonable medical certainty or even a reasonable medical probability. Her opinion is that Plaintiff <u>appears</u> to have a nerve injury and it <u>appears</u> to be permanent. (Exhibit B and Exhibit C, typewritten Progress Note, Exhibit 2 to the deposition of Dr. Brown). Dr. Brown in her deposition and in her Progress Note (Exhibit 2 to her deposition) stated that a referral to a neurologist should be made to fully evaluate and determine final prognosis or further treatment.

A further basis for exclusion of Dr. Brown's testimony is her reliance on Japanese documents which the court has excluded from the trial. Although Dr. Brown apparently took these documents into consideration in formulating her opinion, when asked about the "electromagnetic" treatment Plaintiff says he received in Japan, she said she didn't know what that was:

"Q: Okay. Can you describe for me please what this electromagnetic treatment is that he is receiving?"

"A: I have no idea. That's what he told me he received, don't know what it is."

(Exhibit A: Page 16, line 22 to page 17, line 1)

Notwithstanding the Court's exclusion of the Japanese documents, it would still be impermissible for Dr. Brown to take those documents into consideration in forming her opinion as it has not been established those documents meet the standards of reliability as required by Federal Rules of Evidence 703. There is nothing before the Court to show those records are "of a type reasonably relied upon by experts in the particular field in forming opinions or inference upon the subject, ..."

**CONCLUSION**

Taking into consideration the deposition testimony of Dr. Brown, the handwritten Progress Note (Exhibit B) and the typewritten Progress Note (Exhibit C, Exhibit 2 to Dr. Brown Deposition) it is clear that Dr. Brown should not be permitted to testify as an expert witness in this matter.

Defendant again respectfully requests Dr. Brown be excluded from presenting testimony at the trial of this case.

CARLSMITH BALL LLP

DATED: Saipan, MP, June 5, 2006.

JOHN D. OSBORN
Attorneys for Defendant
Maeda Pacific Corporation

IN THE UNITED STATES DISTRICT COURT
OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| TOSHIHIRO TAKAHASHI, | ] | CIVIL ACTION NO.: CV 05-0026 |
| Plaintiff, | ] | |
| vs. | ] | |
| MAEDA PACIFIC CORPORATION, | ] | |
| Defendant. | ] | |

DEPOSITION

OF

DR. CHRISTINE BROWN

MAY 24, 2006

TRANSCRIBED BY:
*LAWYERS' SERVICES*
*3RD Flr., Nauru Building*
*P.O. Box 501902*
*Saipan, MP 96950*
*Tel.: (670) 2 34-COPY/235-LINK*
*Fax: (670) 234-2679/Fax: (670) 234-0436*
*Email: mdcalvo@hotmail.com*


EXHIBIT A

# APPEARANCES

**Mr. John D. Osborn, Esq.**
**Carlsmith Ball LLP**
Carlsmith Building, Capitol Hill
P.O. Box 5241
Saipan, MP 96950

**Mr. Victorino DLG. Torres, Esq.**
**Torres Brothers and Flores, LLC**
Bank of Guam Bldg., 3rd Floor
P.O. Box 501856
Saipan, MP 96950

**Mr. Jay Livingstone, Esq.**
Office of the Attorney General
Honorable Juan A. Sablan Memorial Building
Caller Box 10007
Saipan, MP 96950

# TABLE OF CONTENTS

|  |  | Page(s) |
|---|---|---|
| DIRECT EXAMINATION of Dr. Brown |  |  |
|  | By Mr. Osborn | 1 |

# EXHIBITS

| 1 | Dr. Brown's Examination Report of Mr. Takahashi dated April 21, 2006 | 16, 17 |
|---|---|---|
| 2 | Progress Note of Dr. Brown | 16, 18 |
| 3 | Invoice from Island Medical Center | 21 |

1   A:   I was.
2   Q:   All right. And where was that case with?
3   A:   Louville, Florida [INAUDIBLE].
4   Q:   Have you ever testified in a court proceeding here in
5        the Commonwealth?
6   A:   No, I have not.
7   Q:   Have you ever been qualified as an expert by any court?
8   A:   No, I have not.
9   Q:   Base on your education, training and experience, do you
10       consider yourself qualified to testify as an expert
11       regarding the nature and extent of injury to Mr.
12       Takahashi's finger in this case?
13  A:   I do.
14  Q:   And what do you feel gives you the qualifications to
15       express an expert opinion in this matter, please?
16  A:   Okay, as well as I went to medical school ---
17  Q:   Okay.
18  A:   --- and I did a family practice residency, which we had
19       exposures to basically all different types of medical
20       sub-specialties; including neurology and I actually
21       spent a couple weeks working with a hand surgeon as
22       well.
23  Q:   And when would that have been?
24  A:   In '91, '92.

4

| | | |
|---|---|---|
| 1 | | because he asked me to be an expert witness and I said |
| 2 | | to do that, I would have to examine the patient.  I |
| 3 | | mean he's doing some of the paper work, but he came to |
| 4 | | my office and --- |
| 5 | Q: | Okay, just so that I understand, Mr. Torres came to |
| 6 | | your office to ask you to be an expert witness in this |
| 7 | | case before you had ever had an opportunity to examine |
| 8 | | Mr. Takahashi? |
| 9 | A: | Correct. |
| 10 | Q: | Am I correct that you examined him only on that one |
| 11 | | occasion? |
| 12 | A: | Right. |
| 13 | Q: | And again that was on April the 19th? |
| 14 | A: | Yes. |
| 15 | Q: | Do you recall how long that examination lasted? |
| 16 | A: | Hmn, twenty minutes. |
| 17 | Q: | Did anyone come with Mr. Takahashi to [INAUDIBLE]? |
| 18 | A: | Yes, with a translator. |
| 19 | Q: | That was Mr. Ji [PHONETIC]? |
| 20 | A: | I believe that was him, correct. |
| 21 | Q: | Did he fulfill any role other than to act as a |
| 22 | | translator for Mr. Takahashi? |
| 23 | A: | No. |
| 24 | Q: | Did he provide any information to you about either the |

1  A:  I did.
2  Q:  All right. Could you describe for us please the extent
3      of the examination that you did with Mr. Takahashi,
4      please?
5  A:  I looked at his shoulder, which of course has --- which
6      has been healed. I looked at his --- the scare in his
7      leg, which had healed, the scare. I looked at his
8      finger, I asked him to move the finger --- first of
9      all, its swollen at the proximal, the --- this joint
10     right here --- it's the MCP joint metacarpalphalangeal
11     joint, so it's the joint between the finger and the
12     hand --- and it was swollen there a little bit.
13 Q:  And when you say it was swollen just a little bit ---
14 A:  Mild swelling.
15 Q:  Okay.
16 A:  Yeah.
17 Q:  Swollen a little bit?
18 A:  Yeah.
19 Q:  Close enough?
20 A:  Yeah.
21 Q:  Okay.
22 A:  I had to move the joint --- that joint, the MCP joint
23     and also the proximal and distal interphalangeal joints
24     which are the ones between the two joints on the finger

14

1  Q: So with sweating, we're talking in terms of
2     perspiration?
3  A: We are talking in terms of perspiration.
4  Q: Okay. All right, I thought it was some different
5     medical reference. Okay. What other examination, if
6     any did you performed?
7  A: That was it.
8  Q: Before we forget, let's go ahead and let's mark as
9     exhibit 1, a copy of the report from a Dr. Brown that's
10    dated April 21st, 2006, of her examination of Mr.
11    Takahashi --- and we got this from Mr. Torres. Let's
12    give that to the doctor and I've got a copy, to you.
13    And then let's mark as exhibit 2, the progress note of
14    Dr. Brown that she referred to earlier in her
15    deposition, okay. In referring to deposition exhibit
16    1, the report, on the second page under section 3,
17    statement of opinions to be express, subsection D,
18    there's a referenced to Mr. Takahashi advising you that
19    he had received some electromagnetic treatment in
20    Japan, do you see that referenced?
21 A: Yeah, yes.
22 Q: Okay. Can you describe for me please what this
23    electromagnetic treatment is that he was receiving?
24 A: I have no idea. That's what he told me he received, I

```
 1           don't know what it is.
 2    Q:     And just so we are all on the same page when we talk
 3           about the complaint that he has with his finger, its
 4           been described as in second finger.
 5    A:     Yeah.
 6    Q:     Which one are we talking about?
 7    A:     Starting with your thumb, second.
 8    Q:     Do you know if Mr. Takahashi was receiving any other
 9           treatment other than this electromagnetic treatment
10           that is referred to on section 3d of exhibit 1?
11    A:     He did not indicate that he was.
12    Q:     Did he indicate to you that he was following any
13           program of what I'll call self-administered treatment?
14    A:     He didn't tell me anything about that.
15    Q:     Was there any testing that was performed on Mr.
16           Takahashi's finger to determine the injury to his nerve
17           other than what you've already described to us?
18    A:     No, there was none.
19    Q:     From that examination are you able to tell us what
20           nerve in fact has been injured?
21    A:     No.
22    Q:     What facts did you relied on in concluding that the
23           injury sustained by Mr. Takahashi was a result of the
24           fall of March 17, 2006?
```

17

1   A:   Correct.
2   Q:   And then you have to assume that the information that
3        person is providing to you is correct?
4   A:   Correct.
5   Q:   And if that information is incorrect and that can lead
6        to an incorrect conclusion on your part?
7   A:   Right.
8   Q:   Would it be a fair statement to say that you would not
9        be qualified to express an opinion as to the cost of
10       any treatment by a neurologist?
11  A:   That would be a fair statement.
12  Q:   At the time that you saw Mr. Takahashi on the 19th of
13       April, he had no complaints with his shin [PHONETIC] or
14       his shoulder, is that correct?
15  A:   Right.
16  Q:   Do you have any opinions regarding Mr. Takahashi that
17       are not expressed in your report, regarding his injury?
18  A:   Regarding his injury?
19  Q:   Sure.
20  A:   No.
21  Q:   Do you anticipate expressing any other opinions on this
22       matter, regarding Mr. Takahashi other than what's in
23       your report?
24  A:   No.

1   Q:   Your report indicates that from your prospective to
2        determine the extent of the injury or the permanency of
3        any injury, that determination should be made by a
4        neurologist, is that a fair statement?
5   A:   Yes.
6   Q:   Okay, that's beyond your area of expertise?
7   A:   Well, I would say that my expertise --- how do I say
8        that --- Hmn, not the --- how to word it.  I think that
9        I'm qualified to say that this is likely to be a
10       permanent injury based on the fact that it --- its
11       persistent for more than a year.
12  Q:   And that's the opinion you've expressed in your report?
13  A:   Right.
14  Q:   Okay.  Thank you.
15       MR. OSBORN:  I have no further questions.  Oh, I take
16       that back.  I do have one or two other questions.
17  Q:   We were provided and I'll mark this as exhibit 3, a
18       copy of what appears to be --- I'm assuming an invoice
19       from Island Medical Center for fifty-seven dollars, did
20       that cover the examination on the 19th?
21  A:   Yeah, that's our first visit fee.
22  Q:   Okay.  And can you tell me what this notation here
23       under description, it says new patient problem
24       something and then 3-1-1-4-3-2, can you interpret that

NAME: TAKAHASHI, TOSHIHIRO    Age: 59    Date: 4-19-06
(IMC) Medical Record # CC-27875    Gender: M
D.O.B: 7-8-46

Temp: 36.7  Pulse: 71  RR:    BP: 160/100   WT: 187 lbs   LMP:
Allergy:

NKDA (✓)

CC:   Mar 17, 2005 - 5-6pm. Working in front
of his Business - Remington
Turned around, small grey pipe
tripped over it - Fell onto
(R) shoulder, (R) hand extended
& R leg was cut - ant shin just
above ankle.
went to PMC next day -
- ankle open cut - went to CHC
tx c̄ medicine & cover. - + oral med
to take.
- R shoulder - Red & painful
- R 2nd finger - pain, felt like
shock.

C/O hi fever the 1st night.

5 dy later - went to Japan -
went to Dr. there. Hosp took XRay
of a finger, shoulder, leg & head. No fractures.
Contm. to have pain in finger. In April 2005 came
back to Saipan saw SHC, then saw Dr. Ada.
over →

EXHIBIT B

Still c̄ finger pain. Return to Japan where he was treated. ? Electronic Magnet treatments in Japan. Helped some - ↓ "shock" & shock full Bottles of drink etott

- Ankle - healed, just scar
- Ⓡ Shoulder - no pain
- Ⓡ Index finger
    - Skin intact
    - Some tend at base of finger, prox dist
    - ↓ ROM to flexion
       MCP full flexion, PIP, DID wasn't fully flex, tender if flexed ext=
       Electrical pain spont, ~3x/day. worse @ nite.
       No eryth/sweating

A/P: Persistant pain Ⓡ 2nd finger s/p fall 1 yr. ago. Pain fuls electrical & is spont, worse @ night - Appears to be a nerve injury. Would Rec. Neurology Ref.      C/Smmmm

Progress Note

Name: Takahashi, Toshihiro   DOB: 07-08-1946   Age 59

Vital Signs: Temp: 36.7   Pulse: 71   BP: 160/100   Wt. 187
Allergy: NKDA

S: Description of injury – On March 17, 2005 at about 5-6:00 PM, the patient was walking in front of his business (Remington). He turned around and tripped over a small gray pipe and fell onto his right shoulder, with his right hand extended. He was also cut on his right leg just above the ankle. At that time he had an open cut to his leg, his right shoulder was red and painful and his right second finger was painful and he felt an electric shock in it. That night he states he had a high fever. The next day he went to Pacific Medical Center. And then he went to CHC where they treated the leg wound with medicine and covered it with a dressing and gave him an oral medicine to take.

Five days later, he went to Japan and went to a doctor there. They took X-rays at the hospital of his finger, shoulder, leg, and head. They told him there were no fractures. The shoulder and leg improved, but he continued to have pain and an electrical shock feeling in the right second finger.

In April, 2005, he returned to Saipan and went to SHC on May 27, 2005, where his finger was x-rayed again (and was negative) and then later he saw Dr. Ada in September.

Mr. Takahashi continued to have right second finger pain and shock feeling. He returned to Japan where he went to an Osteopath who started him on some electromagnetic therapy treatments. It helped a little, reducing the shock feeling. The shock also feels a little better when drinking alcohol. However he continues to have intermittent pain and a shock feeling in his right second finger. The shock feeling occurs up to 3 times a day and is worse at night.

O: Right Shoulder – no scar, full range of motion, no pain.
Right Ankle – healed wound, with scar, nontender, full movement.
Right second finger – skin intact, tenderness and mild swelling at the base of the finger, at the MCP joint. Decreased ROM to flexion at the PIP and DIP joints, which are tender if fully flexed. But there is full flexion at the MCP joint. There is no erythema or sweating on the finger.

A/P:
1. Resolved shoulder injury.
2. Resolved ankle injury.
3. Persistent pain and shock right second finger, status post a fall 1 year ago. The injury to the finger appears to be a nerve injury and appears to be permanent. I would recommend a referral to a neurologist to fully evaluate and determine final prognosis or further treatment.

H. Christine Brown, MD



EXHIBIT C



EXHIBIT 2