F I L E D
Clerk
District Court

JUN - 8 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

1  Victorino DLG. Torres, Esq.
   TORRES BROTHERS, LLC.
2  Attorneys At Law
   P.O. Box 501856
3  Bank of Guam Bldg., 3rd Floor
   Saipan, MP 96950
4  Tel: 670-233-5504/06

5  James Livingstone, Esq.
   Attorney At Law
6  38 Old Wood Rd.
   North Attleboro, MA 02760
7  Tel: 508-695-1615

8

9                   UNITED STATES DISTRICT COURT

10                            FOR THE

11                  NORTHERN MARIANA ISLANDS

12                                          CIVIL ACTION NO. CV 05-0026

13  TOSHIHIRO TAKAHASHI,                    OPPOSITION TO DEFENDANT'S
                                            FURTHER CONSIDERATION OF
14          Plaintiff,                       MOTION IN LIMINE TO EXCLUDE
                                            TESTIMONY OF DR. H. CHRISTINE
15      v.                                  BROWN

16  MAEDA PACIFIC CORPORATION,              DATE:   June 8, 2006
                                            TIME:   9:00 A.M.
17          Defendant.                      JUDGE: Hon. Alex R. Munson

18

19          The Plaintiff, Toshihiro Takahashi, opposes the Defendant's renewed motion to exclude

20
    the testimony of Dr. H. Christine Brown. Dr. Brown has the qualifications and information
21
    needed to render the opinions she renders. Moreover, the opinions are stated with sufficient
22
    certainty to be admissible. Defendant's claims to the contrary are without merit.
23

24  I.      Dr. Brown Has The Expertise To Testify In This Case.

25          Defendant wrongly claims that Dr. Brown, as a general practitioner, cannot testify as to

26
    the permanent nerve damage in the Plaintiff's finger. Both case law and the facts present in this
27
    case belie this contention.
28

1    As a threshold matter, other courts have allowed general practitioners, such as Dr.

2    Brown, to testify as experts regarding whether there was an injury to a nerve and whether or not

3    the injury was permanent. *See Swenson v. Hampton*, 424 S.W.2d 165, 167 (Ark. 1968); *see also*

4
     *Ragusano v. Civic Center Hospital Foundation*, 199 Cal.App.2d 586, 592 19 Cal.Rptr. 118, 122
5
     (1962).
6

7    The *Swenson* case is right on point. In *Swenson*, the defense made the same arguments

8    that are made here. It claimed that a neurological exam, which the expert could not perform, was

9    needed to admit expert testimony regarding a nerve injury and whether it was permanent. *Id.* As

10   here, it claimed that this fact was confirmed because the expert said that they would defer to a

11   neurologist and, in fact, had referred the Plaintiff to see a neurologist. *Id.*

12
     The court rejected these contentions. It held that:
13

14       A general practitioner often refers his patients to specialists, as for the removal of an
         appendix or for the treatment of a skin disease. That does not mean, however, that the G.
15       P. is not qualified to discuss his patients' ailments.

16   *Id.* As a result, the court affirmed the trial court's decision to allow a general practitioner, like

17   Dr. Brown, to testify about a nerve injury and whether it was permanent.

18   This decision is consistent with Ninth Circuit precedent in which that court has allowed

19   experts to testify based simply on their experience and without particularized knowledge of a
20
     specialty. *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). Indeed, if there are
21
22   questions about particularized expertise, those questions go "to the weight accorded her

23   testimony, not to the admissibility of her opinion as an expert." *Id.* at 890.

24   Like the doctor in *Swenson*, Dr. Brown has the experience to render the opinion that the

25   Plaintiff has suffered permanent nerve damage. Only by ignoring her experience can the

26   Defendant come to another conclusion. Dr. Brown graduated from medical school in 1992 and

27   has practiced as a general practitioner for the entire fourteen year period since that graduation.
28

Curriculum Vitae H. Christine Brown, Ex. A. Defense counsel failed to ask what this experience entailed. Plaintiff's proffer that had the inquiry been made, it would have revealed that she has examined and diagnosed other nerve injuries that were determined to be permanent and non-permanent.

Besides her qualifications, the facts of this case support Dr. Brown's opinion. Based on Dr. Brown's extensive experience in private practice, she examined the patient and his x-rays. Brown Deposition, Ex. B, at 8:6-7, 14:5-16:7. She explored alternative theories until she reached her conclusion. *Id.* at 14:5-16:7. And she relied on the examination reports of other Saipan medical clinics. *Id.* at 6:16. Notably, two of the other examination reports also conclude that there was nerve injury. Progress Notes, Saipan Health Clinic, May 27, 2005, Ex C; Examination Report, Dr. Norma Ada, Medical Associates of the Pacific, LLC, September 12, 2005, Ex. D. And Dr. Brown relied on the time over which the nerve injury has not healed (more than fourteen months) in reaching the conclusion it was permanent. Brown Deposition at 21:7-11. Finally, Dr. Brown has stated under oath that she is qualified to make all the opinions she renders. *Id.* at 4:9-13, 21:6-11.

It does not matter if Dr. Brown is not a neurologist or would defer to the findings of one regarding the extent of the injury. As a general practitioner with fourteen years of experience in private practice, Dr. Brown has the experience necessary to render the opinions she does. Indeed, her opinions are supported by others. Defendant's objections go to the weight to accord her testimony and not to its admissibility.

The bottom line is Dr. Brown has the education, knowledge and experience which "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Ev. 702. For instance, a trier of fact would not know the difference between a sprain and nerve injury nor the typical healing process for injury to a finger. Here, her education, knowledge and

1    experience are not commonly known by the trier of fact and her expertise in the area will be

2    helpful.  It should be admitted.

3    II.    Dr. Brown's Examination Was Adequate.

4
        The Defendant's counsel appears to claim that Dr. Brown's examination was not long
5
6    enough to be sufficient.  The Defendant cannot point to any actual deficiency in the examination

7    of the patient and his x-rays.  Defendant also cannot claim that Dr. Brown had to do anything

8    more to reach her conclusion or that another doctor would have performed additional or even

9    different tests.

10       Dr. Brown examined the Plaintiff, pictures and x-rays of the Plaintiff's injury dated over

11   the course of a year, and reviewed the examination reports from three other Saipan health clinics
12
     prepared over the course of a year.  As discussed above, two of the clinics that examined the
13
14   Plaintiff's hand came to the same conclusion as Dr. Brown:  that he had suffered nerve injury.

15   During Dr. Brown's examination, she looked for and eliminated several alternatives before

16   reaching her conclusion.  Brown Deposition at 14:6-16:7.

17       The history and live examination provided Dr. Brown the information she needed to

18   reach her conclusions.  In short, Dr. Brown's examination was sufficient.  None of Defendant
19
     claims can contradict this.
20

21   III.   Dr. Brown's Opinion Is Specific Enough To Be Admissible.

22       Defendant incorrectly claims that Dr. Brown's opinion is inadmissible because it is not

23   stated with a "reasonable medical certainty or even a reasonable medical probability."

24   Defendant does not explain what these standards mean or even if they apply.  Using the proper

25   standards, the opinions are admissible.

26       As the United States Supreme Court has ruled:  "it would be unreasonable to conclude
27
     that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no
28

certainties in science." *Daubert v. Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993).  As long as the opinion has some basis and trustworthiness, it is admissible.  *Id.* at 590 n.9.

As explained above, Dr. Brown's opinions are based on her fourteen years of practice as a general practitioner, her examination of the patient, the examinations of other doctors, and the length of time that injury has persisted.  And the opinions are stated with sufficient clarity for admission.  Dr. Brown states that there is nerve damage based on her examination and that it is permanent based on the persistence of the injury beyond the normal time an injury would heal.  That experience and evidence provides a sufficient basis and trustworthiness to admit her opinions.

In addition, the terms "reasonable medical certainty" or "reasonable medical probability", assuming they are relevant, simply mean more likely than not.  *Burke v. Town of Walpole*, 405 F.3d 66, 91 (1st Cir. 2005) (citing Black's Law Dictionary 1294 (8th ed.2004)).  Dr. Brown's opinions, even though some are qualified, meet this standard.

Finally, Dr. Brown's opinions are sufficiently reliable.  If there are questions, however, the proper mechanism is not to exclude the evidence, but instead use other mechanisms allowed.  For instance, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

1

## CONCLUSION

2

Dr. Brown's testimony is admissible. She has the qualifications and factual basis for her

3

opinions, she has conducted a sufficient investigation, and she states her opinions with a

4

sufficient degree of certainty. Defendant's contentions to the contrary are simply objections that

5

go to the weight her testimony should be provided, not its admissibility. Each should be

6

7

rejected.

8

9

Date:   June 7, 2006.

James D. Livingstone

10

11

12

Victorino DLG. Torres
Torres Brothers, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# *Curriculum Vitae*
## *H. Christine Brown*

### Current Address

PO Box 504669 CK
Saipan, MP 96950
Phone: (670) 235-8880
e-mail: hcbrown@yahoo.com

### Personal

Birth Date: August 29, 1959
Birth Place: Saiki, Japan
Marital Status: Single

### Residency

University of Cincinnati                                     1992 - 1995
Family Medicine Residency Training Program
International Health Track
Cincinnati, Ohio

### Medical Education

University of South Florida                                  1988 - 1992
College of Medicine
Tampa, Florida
M.D., May 1992

### Undergraduate Education

University of Central Florida                               1986 - 1988
Orlando, Florida
B.S. in Biology, May 1998

University of Central Florida                               1979 - 1982
Orlando, Florida
B. S. in Respiratory Therapy, July 1982

Stetson University                                          1978 - 1979
DeLand, Florida

Oral Roberts University                                     1977 – 1978
Tulsa, Oklahoma

EXHIBIT

A

**Professional Experience**

Hendry Family Care Center
500 West Sagamore Avenue
Clewiston, Florida 33440

August 1995
to December 1999

Locum Tenens in Queensland, Australia
Global Medical Staffing
Salt Lake City, Utah

January 2000
to September 2000

Elder Health of Volusia
1555 Saxon Blvd., Suite 501
Deltona, Florida

November 2000
to July 2001

Island Medical Center
PO Box 504669 CK
Saipan, MP 96950

April 2002
to Present

**Certification**

NBME Part I:  June 1990
NBME Part II:  September 1991
NBME Part III:  May 1993
Board Certified Family Practice 1995

# IN THE UNITED STATES DISTRICT COURT
## OF THE
## COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| TOSHIHIRO TAKAHASHI,          ] | CIVIL ACTION NO.: CV 05-0026 |
|              Plaintiff,    ] | |
|            vs.       ] | |
| MAEDA PACIFIC CORPORATION,   ] | |
|            Defendant.   ] | |

## DEPOSITION

### OF

### DR. CHRISTINE BROWN

### MAY 24, 2006

**TRANSCRIBED BY:**
*LAWYERS' SERVICES*
*3RD Flr., Nauru Building*
*P.O. Box 501902*
*Saipan, MP 96950*
*Tel.: (670) 2 34-COPY/235-LINK*
*Fax: (670) 234-2679/Fax: (670) 234-0436*
*Email: mdcalvo@hotmail.com*

EXHIBIT

B

```
 1    A:   I was.

 2    Q:   All right.  And where was that case with?

 3    A:   Louville, Florida [INAUDIBLE].

 4    Q:   Have you ever testified in a court proceeding here in

 5         the Commonwealth?

 6    A:   No, I have not.

 7    Q:   Have you ever been qualified as an expert by any court?

 8    A:   No, I have not.

 9    Q:   Base on your education, training and experience, do you

10         consider yourself qualified to testify as an expert

11         regarding the nature and extent of injury to Mr.

12         Takahashi's finger in this case?

13    A:   I do.

14    Q:   And what do you feel gives you the qualifications to

15         express an expert opinion in this matter, please?

16    A:   Okay, as well as I went to medical school ---

17    Q:   Okay.

18    A:   --- and I did a family practice residency, which we had

19         exposures to basically all different types of medical

20         sub-specialties; including neurology and I actually

21         spent a couple weeks working with a hand surgeon as

22         well.

23    Q:   And when would that have been?

24    A:   In '91, '92.
```

4

1    Q:    Could that have been as part of your medical school

2          training or residency?

3    A:    Part of my residency.

4    Q:    And where did you do your residency?

5    A:    University of Cincinnati [INAUDIBLE].

6    Q:    That was in the family medicine residency training

7          program?

8    A:    Right.

9    Q:    I noticed, looking at your CV under residency it shows

10         "international health track" what is that, please?

11   A:    My residency had --- kinda focused on learning to do

12         medicine in [INAUDIBLE] areas and stuff like that and

13         actually part of my training was done in Kenya and

14         [INAUDIBLE].

15   Q:    To the best of your recollection, when were you first

16         contacted to be an expert witness in this case?

17   A:    It's been a month or so ago.

18   Q:    I see you have some documents with you today for your

19         deposition, would you recite for us please what

20         documents you brought with you to the deposition today?

21   A:    Okay.  I have a copy of my progress note when I

22         interviewed Mr. Takahashi.

23   Q:    And what's the date of that please?

24   A:    I interviewed him on --- April 19, 2006.

1    Q:   Okay.  May I see that document, I want to make sure

2         that I got a copy of it?

3    A:   I didn't put the date on the [INAUDIBLE], I can't

4         believe I did that, but that was the date.

5    Q:   I have a copy of that, that document, okay.

6    A:   Okay.  And then I have copy of his medical records from

7         Pacific Medical Care on March 18.  A record of

8         treatment of [INAUDIBLE] in Japan on March 20th, an

9         interpretation was that medical records from Saipan

10        Health Center, an interpretation of his right hand x-

11        ray on May 27, 2005.  Medical record report from Dr.

12        Norma Ada on September 12, 2005.  Some receipts and

13        medical certifications from Dr. Suyu [PHONETIC] in

14        Japan from April 5, 2005 through March 2006.  I have

15        copy of the depositions of Mr. Takahashi on April 12,

16        2006 and [INAUDIBLE].

17   Q:   And you have all those documents with you today?

18   A:   Yes.

19   Q:   May I see those, please?

20   A:   [INAUDIBLE].

21   Q:   Do you have any other documents that you relied on in

22        forming the opinions that you've expressed in your

23        report to Mr. Torres?

24   A:   No.

1 Q: Let me set this over here so I don't get them all

2   messed up.  Your reports or the copies of the notes you

3   have from Pacific Medical Center actually begin on

4   August the 19th, 2004 and go through January the 18th,

5   2006, will that be correct?

6 A: Yes.

7 Q: Also, I noticed on your resume that you were born in

8   Japan.

9 A: I was.

10 Q: Do you have any Japanese language skills?

11 A: None, I know a few words, but.

12 Q: You won't ---

13 A: I left Japan when I was four.

14 Q: --- okay, you won't be qualified to make your own

15   interpretation anyway?

16 A: No, I'm [INAUDIBLE].

17 Q: Well, if there's an issue in this case and that's why I

18   wanted to make sure on the record that you would not be

19   qualified to make any interpretation of any Japanese

20   language ---

21 A: Not really [UNINTELLIGIBLE].

22 Q: Let me finish my question, please.

23 A: Yes.

24 Q: Your not qualified to make any interpretation of a

7

1         Japanese language document that has been provided in

2         this case?

3    A:   No.

4    Q:   Okay, thank you.  Go ahead, you were going to say

5         something?

6    A:   Yeah, the one thing I don't have with me that I did

7         have was I looked at the x-ray itself.

8    Q:   Okay.

9    A:   This x-ray, in fact, I photo-copied it.

10   Q:   Is that the one from Saipan Health Clinic?

11   A:   Saipan Health and that's --- that was with it, that

12        interpretation.

13   Q:   Okay.  And if I understand, if I can read that, that

14        says no fractured?

15   A:   Right.

16   Q:   Okay, thank you doctor.  For the record I think I have

17        copies of all of these documents with the exception of

18        the x-ray and the interpretation that was attached to

19        it.

20        MR. TORRES:    Do you want a copy of that?

21        MR. OSBORN:    That's not necessary, if I want it I'll

22        give it --- give you a howler.

23   Q:   Do you have any other file of your examination of Mr.

24        Takahashi other than what you have with you today with

1   A:  I did.

2   Q:  All right.  Could you describe for us please the extent

3       of the examination that you did with Mr. Takahashi,

4       please?

5   A:  I looked at his shoulder, which of course has --- which

6       has been healed.  I looked at his --- the scare in his

7       leg, which had healed, the scare.  I looked at his

8       finger, I asked him to  move the finger --- first of

9       all, its swollen at the proximal, the --- this joint

10      right here --- it's the MCP joint metacarpalphalangeal

11      joint, so it's the joint between the finger and the

12      hand --- and it was swollen there a little bit.

13  Q:  And when you say it was swollen just a little bit ---

14  A:  Mild swelling.

15  Q:  Okay.

16  A:  Yeah.

17  Q:  Swollen a little bit?

18  A:  Yeah.

19  Q:  Close enough?

20  A:  Yeah.

21  Q:  Okay.

22  A:  I had to move the joint --- that joint, the MCP joint

23      and also the proximal and distal interphalangeal joints

24      which are the ones between the two joints on the finger

14

1       ---

2   Q:  Okay.

3   A:  --- and he was able to bent at the MCP joint without

4       pain and without difficulty.  He was --- he had

5       difficulty bending the two interphalangeal joints and

6       it was tender when he did that.

7   Q:  Was it tender to [INAUDIBLE] of the thing?

8   A:  No.

9   Q:  Okay.

10  A:  It was when bending.  And he wasn't able to fully flex

11      those two joints --- those two joints.  And --- there

12      weren't --- was no redness or sweating or anything like

13      that.

14  Q:  I noticed that in your report, when you say no

15      sweating, [UNINTELLIGIBLE]?

16  A:  Yeah, [INAUDIBLE].

17  Q:  That struck me --- something I wasn't familiar with.

18  A:  I mean there's a condition called "reflex sympathetic

19      dystrophy" that I wanted to rule out.

20  Q:  Okay.

21  A:  And that is if the sympathetic nerves which are nerves

22      involved in sweating and in [INAUDIBLE], so if people

23      who have reflex sympathetic dystrophy will have redness

24      and will actually have like inappropriate sweating.

15

1    Q:   So with sweating, we're talking in terms of

2         perspiration?

3    A:   We are talking in terms of perspiration.

4    Q:   Okay.  All right, I thought it was some different

5         medical reference.  Okay.  What other examination, if

6         any did you performed?

7    A:   That was it.

8    Q:   Before we forget, let's go ahead and let's mark as

9         exhibit 1, a copy of the report from a Dr. Brown that's

10       dated April 21st, 2006, of her examination of Mr.

11       Takahashi --- and we got this from Mr. Torres.  Let's

12       give that to the doctor and I've got a copy, to you.

13       And then let's mark as exhibit 2, the progress note of

14       Dr. Brown that she referred to earlier in her

15       deposition, okay.  In referring to deposition exhibit

16       1, the report, on the second page under section 3,

17       statement of opinions to be express, subsection D,

18       there's a referenced to Mr. Takahashi advising you that

19       he had received some electromagnetic treatment in

20       Japan, do you see that referenced?

21    A:   Yeah, yes.

22    Q:   Okay.  Can you describe for me please what this

23       electromagnetic treatment is that he was receiving?

24    A:   I have no idea.  That's what he told me he received, I

16

1  Q:  Your report indicates that from your prospective to

2      determine the extent of the injury or the permanency of

3      any injury, that determination should be made by a

4      neurologist, is that a fair statement?

5  A:  Yes.

6  Q:  Okay, that's beyond your area of expertise?

7  A:  Well, I would say that my expertise --- how do I say

8      that --- Hmn, not the --- how to word it.  I think that

9      I'm qualified to say that this is likely to be a

10     permanent injury based on the fact that it --- its

11     persistent for more than a year.

12 Q:  And that's the opinion you've expressed in your report?

13 A:  Right.

14 Q:  Okay.  Thank you.

15     MR. OSBORN:   I have no further questions.  Oh, I take

16     that back.  I do have one or two other questions.

17 Q:  We were provided and I'll mark this as exhibit 3, a

18     copy of what appears to be --- I'm assuming an invoice

19     from Island Medical Center for fifty-seven dollars, did

20     that cover the examination on the 19th?

21 A:  Yeah, that's our first visit fee.

22 Q:  Okay.  And can you tell me what this notation here

23     under description, it says new patient problem

24     something and then 3-1-1-4-3-2, can you interpret that

21

PROGRESS NOTES

Name: TOSHIHIRO TAKAHASHI

05/27/05
pain

140/80
98.1 / 178

CURRENT MEDICATIONS

MAJOR PROBLEMS
LMP:
Cigarette:
Accident/Work Related Accident/Auto Accident: yes
(Describe Above: as above was just walking outside the sidewalk
by his business place , sudden trip by a pipe along the sidewalk
, hitting his rt.hand down to the ground  and also got cut on his
rt.leg , was seen at PMC -given medicine and x-ray done , then
when back to Japan , also x-ray was done and given medicine with
thrapy .electrical impulse  in the rt index finger

.SUBJECTIVE:
PATIENT HISTORY:
This 58 yr y.o. male is complaining of: as above noted since 1
month ago , is here for second opinion , still with pain , numb
and like "shocking sensation " on his rt. hand , nkd  few month
ago  pt stated he slip and traumatized rt index finger few days
later slectrical shock from the distal finger towar the tip fo
the finger

LABORATORY RESULT:


OBJECTIVE:consious alert ward rt index finger plusminimal
swelling noted on the 3rd joint area and no tenderness nor
redness rom good

DOCTOR'S ORDERS:1) x-ray on rt.hand


ASSESSMENT/PLAN: nurve injury rt index finger
prednisone 60 mgm daily for 2 dasy 40 mgm daily for 2 days then
20 mgm daily for 2 days
f/up in japan


#        SIGNED BY JOHN PANGELINAN (JP)                05/27/05




# Medical Associates of the Pacific, LLC

P.O. Box 500938 Suite 100 MH-II Bldg
Saipan, MP  96950
(670)323-9000

**Patient Visit Record**

Page 1
September 12, 2005

---

**Toshiro TAKAHASHI**
PMB 836 P.O. Box 10001
Saipan, MP  96950

Date/Time In:   09/12/2005 - 01:32PM
Date/Time Out:  09/12/2005 - 07:21PM

Patient ID:      TAKA000003
Birth Date:      07/08/1946
Age:             59 Years, 2 Months
Sex:             Male

**Attending Provider:**    Ada, Norma S.
**Vitals Recorded By:**    Torres, Maria J.
**Accompanied By:**        Wei Dong Ji (Translator)

**Chief Complaint:**
59 y.o. appt. re. rt. index finger injured 6 mos. ago. RBS 281mg/dl

**Vitals:**

| | |
|---|---|
| Height: | 73in , 185.42cm  (88%) |
| Weight: | 181 lbs, 82.1 kgs  (79%) |
| BMI: | 23.9 |
| Temperature: | 98.2F, 36.78C |

Blood Pressure:   150 / 90
Respirations:     16
Pulse:            68

**History of Present Illness:**

E/M Elements

New patient here with Japanese translator who happens to be Chinese.  In early March 2005 when walking outside his business near Remington Club, he tripped and fell on concrete sidewalk.  He states his right hand was extended outward and may have jammed his right index finger on concrete sidewalk.  He also cut his right foot.  He sought medical attention at PMC because of cut and right hand also hurt a lot with some ?swelling.  However, within a week of his accident, right index finger started to swell up and also had electrical shock sensations shooting down only that right index finger.  He had an x-ray already done at PMC and was told no broken bones but patient decided to go to Japan to seek medical attention.  Over there, he saw a bone doctor and had x-rays done which showed no broken bones.  He was also seen at Saipan Health clinic in May, had x-rays done and was also put on steroids for ?inflammatory process.  However, pt still has electrical shock sensation at his right index finger.  No increase pain with cold or hot exposure, able to use his finger, make a fist, but the pain sensation is very uncomfortable.  No known fever.

Pt is a smoker and also history of high blood sugar which he doesn't call diabetes for about a year.  He takes a medicine for his high blood sugar once a week but not sure of name.

**Review of Systems:**

| | |
|---|---|
| HEENT | No blurry vision |
| Chest | No findings. |
| Cardiac | No findings. |
| Abdomen | No findings. |
| Urinary Tract | No polyuria |
| Genital | No findings. |
| Orthopedic | Right index finger pain-see HPI. |
| Neurological | No findings. |
| Psychosocial | No findings. |
| Endocrine | High blood sugar for about a year-evaluated by doctor in Japan. |

**Physical Exam:**

| | |
|---|---|
| Appearance | Normal, smells like tobacco; limited history due to poor translation for his friend/translator |
| Skin | Clear, pink no unusual pigmentation. No rashes or lesions seen.  No discoloration of right hand index finger. |
| Head | Atraumatic, normocephalic |
| Eyes | Pupils equal, round react to light and accomodation. Sclerae clear. No discharge or tearing. Extra ocular muscles full ROM. |


EXHIBIT
D

# Medical Associates of the Pacific, LLC

P.O. Box 500938 Suite 100 MH-II Bldg
Saipan, MP  96950
(670)323-9000

**Patient Visit Record**

Page 2
September 12, 2005

---

**Toshiro TAKAHASHI**
PMB 836 P.O. Box 10001
Saipan, MP  96950

Date/Time In:    09/12/2005 - 01:32PM
Date/Time Out:   09/12/2005 - 07:21PM

Patient ID:     TAKA000003
Birth Date:     07/08/1946
Age:    59 Years, 2 Months
Sex:    Male

| | |
|---|---|
| Nose | Normal appearance. Septum undeviated. No discharge. |
| Neck | Supple. |
| Chest | Clear to auscultation and percussion. Normal appearance. |
| Cardiac | S1 and S2 with normal physiological split. No murmurs, rubs or heaves. |
| Abdomen | Soft, non-tender, no masses or organomegaly, bowel sounds normal |
| Extremities | No cyanosis or clubbing, peripheral pulses palpable.  Mild edema with deformity at volar aspect of right index finter along PIP medial edge.  Able to fully flex and extend at PIP and DIP joints of right index finger. |
| Neurological | Normal gross motor and sensory of UE and LE.  DTR's 2+ bilat UE and LE.  No atrophy or muscle wasting of right intrinsic hand muscles or those of right index finger. |

**Assessments:**

| | |
|---|---|
| 782.0 | DISTURBANCE SKIN SENSATION |
| 250.02 | DIABETES UNCOMP TYPE II UNCONTRD |

**Plan:**

1. Pt has disabling paresthesia of right index finger; ? reflex sympathetic dystrophy or paresthesia secondary to nerve injuy.  I recommended pt be seen by an orthopedic surgeon for definitive diagnosis and not because suspect fracture, but possibly other musculo-skeletal or nerve crush injury causing his paresthesias.  I recommended Dr. Austin or pt could go to Guam to see Dr. Bollinger-also orthopedic surgeon or the hand surgeon Dr. Jerone Landstrom. Through translator and his employee-Mr. Keith Ada, pt wishes to go to Guam.  I wrote on MAP paper, the name of these doctors and gave them their contact numbers-pt will do his own follow-up.  His friend asks if needs a CT-scan but I do not think this is necessary and should wait until he sees his specialist of choice before ordering a radiological study.
2. If this is RSD, could try topical capsaicin therapy.
3. Emphasized with patient that with his high blood sugar or diabetes (language barrier), blood sugar needs to be better controlled.
4. RTC prn.

---

Norma S. Ada  09/12/2005 07:21PM